**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MACOMB FOOT, ANKLE & WOUND CARE, et al.,      ) ) ) ) | |
| Plaintiffs,      ) ) | |
| v.      ) ) | Case No. 24-cv-00869 (APM) |
| ROBERT F. KENNEDY JR.,[1] *in his official capacity as Secretary of Health and Human Services*, et al.,      ) ) ) ) | |
| Defendants.      ) ) | |

<u>**MEMORANDUM OPINION**</u>

## I.    INTRODUCTION

Plaintiff StimLabs, LLC is a biotechnology company that manufactures, markets, and distributes human cells, tissues, and cellular and tissue-based products, or HCT/Ps.  Plaintiffs Macomb Foot, Ankle & Wound Care ("Macomb") and FASA Family Wellness, PLLC ("FASA") are medical providers who treat patients using Corplex P, an HCT/P manufactured by StimLabs. Together, Plaintiffs challenge the lawfulness of a purported covert policy adopted by Defendants Secretary of Health and Human Services ("Secretary") and Administrator of the Center for Medicare and Medicaid Services ("CMS") categorically excluding HCT/Ps, including Corplex P, from Medicare coverage and reimbursement.  Plaintiffs argue that this policy (1) comprised a substantive change in law triggering the Medicare notice-and-comment rulemaking requirement; (2) was applied retroactively, contrary to law; and (3) is arbitrary and capricious under the

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes the current Secretary of Health and Human Services as the defendant in this case.

Administrative Procedure Act ("APA").  Plaintiffs Macomb and FASA also challenge final decisions by the Secretary denying Medicare coverage and reimbursement for specific instances of the use of Corplex P as arbitrary and capricious and unsupported by substantial evidence. The parties have filed competing cross-motions for summary judgment.

For the reasons that follow, Plaintiffs' Motion for Summary Judgment and Declarative Relief, ECF No. 22, is denied, and Defendants' Cross-Motion for Summary Judgment, ECF No. 29, is granted.

## II.    BACKGROUND

Much of the statutory framework and factual background in this case regarding the Medicare reimbursement program, coverage of HCT/Ps, the two February 2022 Technical Direction Letters ("TDLs"), and the March 2022 TDL have already been set forth in *StimLabs, LLC v. Becerra* (*StimLabs I*), 636 F. Supp. 3d 165, 169–71  (D.D.C. 2022); *see also Row 1 Inc. v. Becerra*, No. 22-cv-718, 2023 WL 183687 (D.D.C. Jan. 12, 2023), *aff'd*, 92 F.4th 1138 (D.C. Cir. 2024).  Background on FDA regulation of Corplex P and HCT/Ps, Sections 351 and 361 of the Public Health Service Act, and the Medicare program's "reasonable and necessary" standard was further discussed in *Greiner Orthopedics, LLC v. Kennedy*, No. 23-cv-1047, 2026 WL 63318, at *1–3 (D.D.C. Jan. 8, 2026).  The court here incorporates those facts by reference and supplements them with additional facts specific to this case.

### A.    Corplex P

Corplex P is an HCT/P manufactured by Plaintiff StimLabs.  *See* Pls.' Mot. for Summ. J. & Declarative Relief, ECF No. 22 [hereinafter Pls.' Mot.], Pls.' Mem. of Law in Supp. of Pls.' Mot., ECF No. 22-1 [hereinafter Pls.' Mem.], at 5.  By StimLabs's own description, it is a "Wharton's Jelly allograft product [that] is donated human tissue obtained from umbilical cord

through removal of the cellular epithelial layer, vein, and arteries, dehydrated (freeze-dried), cut into small pieces . . . , and presented in graft form." J.A., ECF No. 37, at 35. Corplex P allografts are intended for homologous use, *id.*, which is "the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissue with an HCT/P that performs the same basic function or functions in the recipient as in the donor," 21 C.F.R. § 1271.3(c). Corplex P's intended homologous use is the "supplementation of connective tissue voids in open wound environments to protect and cushion the surrounding tissue." J.A. at 35. It is not an exosome or stem cell product, nor has it ever been marketed as one. *Id.* at 21; *see also* Pls.' Mem. at 6.

At some point, StimLabs determined that Corplex P satisfies the criteria to be regulated as a Section 361 product. J.A. at 18; Pls.' Mem. at 8. StimLabs maintained this assessment even after the FDA updated its interpretation of the criteria in 2019. Pls.' Mem. at 10–11. The FDA confirmed StimLabs's compliance with Section 361 requirements upon conducting inspections in 2017, 2018, and 2022. J.A. at 18; Pls.' Mem. at 9. After the instant suit was filed, the FDA approved Corplex P as a medical device under Section 510(k) of the Food, Drug, and Cosmetic Act. Pls.' Mem. at 6. StimLabs has never been subject to adverse action by the FDA with respect to the manufacture and sale of Corplex P. *Id.* at 9.

Corplex P's Healthcare Common Procedure Coding System ("HCPCS") code, or "Q code," is Q4206. J.A. at 49. HCPCS codes are national codes used by CMS and physicians to identify and describe services rendered. *Id.* Q codes are a type of temporary HCPCS code used to "identify drugs, biologicals, and medical equipment or services not identified by specific Medicare coverage or payment indicators . . . but for which codes are needed for Medicare claims processing." *Id.* at 49–50.

3

There is no final rule, national coverage determination, or local coverage determination governing Medicare coverage and reimbursement as to the application of Corplex P for wound care or the treatment of ulcers. *Id.* at 144, 212.

**B.    HCT/P Guidances**

Agencies occasionally publish guidance and consumer alerts related to HCT/Ps. As relevant here, on July 22, 2020, the FDA issued a consumer alert advising that "[a]nyone considering the use of anything purported to be a regenerative medicine product, including stem cell products, exosome products, or other widely promoted products such as products derived from adipose tissue . . . , human umbilical cord blood, Wharton's Jelly, or amniotic fluid should know" that "[n]one of these products have been approved to treat . . . chronic pain." *Consumer Alert on Regenerative Medicine Products Including Stem Cells and Exosomes*, U.S. FDA (July 22, 2020), https://www.fda.gov/vaccines-blood-biologics/consumers-biologics/consumer-alert-regenerative-medicine-products-including-stem-cells-and-exosomes [hereinafter 2020 FDA Consumer Alert].

On June 3, 2021, the FDA published a similar consumer alert "reemphasiz[ing] the warning to consumers in FDA's July 2020 Consumer Alert." *Important Patient and Consumer Information About Regenerative Medicine Therapies*, U.S. FDA (June 3, 2021), https://www.fda.gov/vaccines-blood-biologics/consumers-biologics/important-patient-and-consumer-information-about-regenerative-medicine-therapies [hereinafter 2021 FDA Consumer Alert]. This alert, too, warned of "unapproved products" recovered from "stem cells, . . . umbilical cord blood and/or cord blood stem cells, amniotic fluid, Wharton's jelly, . . . and exosomes" that "have not been approved to treat . . . chronic pain." *Id.*

On August 10, 2021, the CMS Center for Program Integrity's Investigations and Fraud Prevention Partnership Group and the Investigations Medicare Drug Integrity Contractor issued a

guidance document about HCT/Ps called "Alert: Human Cell and Tissue Products." J.A. at 51 [hereinafter 2021 CMS Guidance].  This guidance addressed "questionable billing of Q-codes related to amniotic tissue injections using human cell and tissue products."  *Id.*  It noted that "the use of amniotic tissue products for treatment of pain is considered off-label and is not covered by Original Medicare."  *Id.*

The FDA has also issued several warning letters to specific manufacturers regarding the regulatory status and compliance of their HCT/Ps.  *Id.*

### C.       Procedural History

In 2021, Macomb and FASA used Corplex P to treat Medicare beneficiaries experiencing toe, heel, or leg ulcers and sought reimbursement for those treatments from Medicare.  Pls.' Mem. at 12, 15.  Their procedural paths differ slightly, but in both cases, the final agency action was a denial of claims for Medicare reimbursement.[2]

On three different occasions between October and December 2021, Macomb treated one Medicare beneficiary's chronic leg ulcer with Corplex P.  J.A. at 44, 166.  Macomb submitted an initial reimbursement claim for these treatments to its Medicare Administrative Contractor ("MAC"), but the claim was denied.  *Id.* at 44.  On redetermination, the denials for dates of service on October 25, 2021, and November 22, 2021, were affirmed.  *Id.*  Macomb then requested reconsideration by a Qualified Independent Contractor ("QIC"), who also affirmed the denials for services rendered in October and November 2021 but dismissed the request as to date of service December 13, 2021, because a MAC had not first conducted a redetermination as to that particular treatment.  *Id.* at 104.  In 2023, an ALJ again affirmed that the uses of Corplex P in October and November were not covered by Medicare and dismissed the request for a hearing as to the

---

[2] The ALJ's determination as to Macomb's claims for reimbursement begins at J.A. 44.  The Medicare Appeals Council's determination as to FASA's claims for reimbursement begins at J.A. 190.

December date of service because of the QIC's dismissal below. *See id.* at 44–55, 92. Macomb then sought an appeal with the Medicare Appeals Council ("Appeals Council"), which failed to act within the required 90-day period under 42 C.F.R. § 405.1100(c) and thereafter granted escalation to federal district court pursuant to 42 C.F.R. § 405.1132. *See id.* at 2. The ALJ's determination is therefore the agency's final action as to Macomb. *See* Pls.' Mem. at 15; Defs.' Mem. of P. & A. in Supp. of Defs.' Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot., ECF No. 29 [hereinafter Defs.' Mem.], at 2.

Between July and October 2021, FASA treated eight Medicare beneficiaries with Corplex P for toe, heel, and leg ulcers that were not responsive to prior conservative treatment. J.A. at 191, 210–12. FASA's original claim for reimbursement as to those eight beneficiaries was initially approved and paid. *Id.* at 191. But that approval was later reopened by a Medicare integrity coordinator and denied. *Id.* After the denial was affirmed by a MAC and a QIC on redetermination, FASA sought review by an ALJ who in 2023 overturned the denials, concluding that the uses of Corplex P were covered services. *Id.* at 191–92. But on its own motion, the Appeals Council reversed that decision, finding that the ALJ erred as a matter of law. *Id.* at 188, 203–04. The Appeals Council's decision is the agency's final action as to FASA. *See* Pls.' Mem. at 16; Defs.' Mem. at 2.

Plaintiff StimLabs, along with two health care providers, first filed suit against Defendants in federal court in July 2022 seeking a preliminary injunction as to the nationwide policy set forth in the February 2022 TDLs of automatically denying Medicare coverage for use of HCT/Ps. *StimLabs I*, 636 F. Supp. 3d at 168–71; *see also StimLabs, LLC v. Becerra* (*StimLabs II*), 651 F. Supp. 3d 56 (D.D.C. 2023). This court dismissed that case because the plaintiffs failed to administratively exhaust their claims. *StimLabs I*, 636 F. Supp. 3d at 169; *StimLabs II*,

651 F. Supp. 3d at 59.    Then, in April 2023, Plaintiff StimLabs brought a new action, *Greiner Orthopedics, LLC v. Kennedy*, with four health care providers, including Plaintiff Macomb, again challenging the policies in the February 2022 TDLs as well as the ALJs' final determinations on the 15 reimbursement claims made by three of the health care providers for use of HCT/Ps Ascent and Corplex P.  *Greiner*, 2026 WL 63318, at \*1–4.  The court granted summary judgment in favor of Defendants for several reasons, including that (1) the challenge to the *sub silentio* policies was non-justiciable, (2) the court lacked subject-matter jurisdiction over that same challenge for failure to exhaust, and (3) neither Macomb nor Corplex P was the subject of any of the final agency determinations on review because Macomb's claims were still pending before an ALJ at the time the *Greiner* plaintiffs filed suit.  *Id.* at \*5–8.

Plaintiffs filed the instant action on March 26, 2024.  *See* Compl., ECF No. 1.  The parties now seek summary judgment.  Plaintiffs argue that Defendants continue to covertly enforce an automatic-denial policy for HCT/Ps set forth in the February 2022 TDLs, notwithstanding the March 2022 TDL repealing that policy.  As all plaintiffs have in *StimLabs I* and *II*, *Row 1*, and *Greiner*, Plaintiffs here maintain that this *sub silentio* policy (1) comprises a substantive change in law triggering the Medicare notice-and-comment rulemaking requirement; (2) was applied retroactively, contrary to law; and (3) is arbitrary and capricious under the APA.  *See* Pls.' Mem. at 2, 36.  In addition, Plaintiffs here challenge the final decisions by the Secretary denying Medicare coverage and reimbursement for specific instances of the use of Corplex P as arbitrary and capricious and unsupported by substantial evidence.  *See id.* at 2.  As to the remedy, Plaintiffs ask that the policy and the two final decisions be declared unlawful and set aside.  *Id.*

### III.    STANDARD OF REVIEW

When a party seeks summary judgment as to final agency action under the APA, "the district judge sits as an appellate tribunal" and "[t]he 'entire case' on review is a question of law." *Am. Biosci. Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases).  Rather than decide whether there is a genuine dispute of material fact under Rule 56, the court must "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (internal quotation marks omitted).  The court's review of final agency action is limited to the administrative record, except in a few narrow instances.  *See United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 3–4 (D.D.C. 2017); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

As relevant here, the court may set aside final agency action under the APA when it is arbitrary and capricious or unsupported by substantial evidence.  5 U.S.C. § 706(2)(A), (E).  The arbitrary-and-capricious and unsupported-by-substantial-evidence tests are overlapping, as the distinction between them is "largely semantic."  *See Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Reserve Sys.* (*ADAPSO*), 745 F.2d 677, 684 (D.C. Cir. 1984) (collecting cases and authorities).

The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).  The standard requires only that "agency action be reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), in that the agency must "examine the relevant data and articulate a satisfactory explanation

for its action," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (internal quotation marks omitted).  In other words, the agency's decision must demonstrate a "rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43 (internal quotation marks omitted).  In Medicare cases, the "tremendous complexity of the Medicare statute . . . adds to the deference which is due to the Secretary's decision."  *Dist. Hosp. Partners v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) (internal quotation marks omitted).

Agency action is "unsupported by substantial evidence" if it is not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619–20 (1966) (internal quotation marks omitted). "Substantial evidence" is "something less than the weight of the evidence."  *Id.* at 620.  And the court may not displace an agency's "choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

## IV.    DISCUSSION

### A.    Justiciability

The parties' dispute over justiciability is unusual.  Defendants did not affirmatively raise any justiciability issues in their cross-motion, but Plaintiffs launch a defense against mootness in their responsive brief anyway.  *See* Pls.' Mem. of Law in Opp'n to Defs.' Mot. & Reply Br. in Supp. of Pls.' Mot., ECF No. 33 [hereinafter Pls.' Opp'n], at 23–25; Defs.' Reply in Supp. of Defs.' Mot., ECF No. 36 [hereinafter Defs.' Reply], at 23 n.6.  Plaintiffs appear to be responding to mootness issues raised in their prior suits.  *See, e.g.*, *Row 1*, 92 F.4th at 1143–45; *Greiner*, 2026 WL 63318, at *5.  Whatever was Plaintiffs' concern over mootness is ultimately inapposite. As in *Greiner*, the proper justiciability concern here is one of standing.  *Greiner*, 2026 WL 63318,

at *5.  Neither party has raised it, but the court still must be satisfied Plaintiffs have standing. *See Elec. Priv. Info. Ctr. v. FAA*, 821 F.3d 39, 41 n.2 (D.C. Cir. 2016).

Unlike in *Row 1* and *Greiner*, Plaintiffs here do not directly challenge the February TDLs themselves so avoid justiciability issues as to that claim.  *See Row 1*, 92 F.4th at 1144–45; *Greiner*, 2026 WL 63318, at *5–6.  But they maintain that Defendants have adopted "nationwide policies that prohibit Medicare coverage for HCT/Ps" by "creating a whole new category of non-covered items and related services" as to HCT/Ps, effectively adopting a "blanket exclusion of certain HCT/Ps from Medicare coverage."  Pls.' Mem. at 1, 35–36.  In other words, Plaintiffs contend that Defendants continue to covertly apply the automatic-denial policy set forth in the February 2022 TDLs, even though that policy was repealed by the March 2022 TDL.  *See Greiner*, 2026 WL 63318, at *6.  Plaintiffs here, as in *Greiner*, fail to establish standing as to this claim.  *See id.*

Establishing standing at the summary judgment stage cannot rest on allegations alone, and in this case that requires Plaintiffs to come forward with specific facts that a covert policy existed and that it caused Plaintiffs' injuries.  *See Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012).  But once again, Plaintiffs have not pointed to any record evidence that would establish such a covert policy or its application.  Instead, they ask the court to infer its existence and effect from Defendants' alleged departure from their "past practice of Medicare coverage for Corplex P," Pls.' Mem. at 32, insisting that Defendants "cannot point to a single case in which a Medicare claim for Corplex P was covered and paid after March 2022," Pls.' Opp'n at 27.  But Plaintiffs offer nothing to demonstrate any "past practice" of approving reimbursements for treatments using HCT/Ps.  *Cf.* J.A. at 170 (Macomb's physician testifying that the beneficiary in question was "the first patient I used [Corplex P] on.").  Even if there were instances of reimbursing

uses of HCT/Ps in the past, the fact that Plaintiffs' claims specifically were denied does not show that the denials were the result of a blanket policy.

Plaintiffs also point to the substance of the agency's final decisions as evidence of a covert automatic-denial policy. Specifically, they observe that the reasons given by the Appeals Council and the ALJ to deny their reimbursement claims mirror those justifying the automatic-denial policy that CMS originally issued in the February 2022 TDLs, such as that HCT/Ps are "experimental or investigational" or that Corplex P has not been approved by the FDA. Pls.' Mem. at 37; Pls.' Opp'n at 27 & n.33. But that is hardly evidence. The March 2022 TDL expressly directs MACs to "suspend" the automatic denials introduced in the February 2022 TDLs and instead "institute claim-by-claim review to determine whether a claim meets the reasonable and necessary criteria" and "reopen any claims that had been processed under the automatic denials." *StimLabs I*, 636 F. Supp. 3d at 171. Application of the "reasonable and necessary criteria" as required by the Medicare statute for claim reimbursement necessitates considering whether an "an item or service" is "experimental or investigational" and "safe and effective," among other things. *See* Medicare Program Integrity Manual ("MPIM") § 3.6.2.2. And whether an item or service has obtained FDA approval is a relevant consideration in these inquiries. *See Greiner*, 2026 WL 63318, at *10–11. That the agency also considered similar factors in the rescinded TDLs does not mean that, notwithstanding their recission, claims adjudicators still relied on them—but covertly—to deny claims.

The operation of a blanket, automatic-denial policy is clearly different from the operation of a claim-by-claim determination, even if the outcomes rendered might be the same. At this stage, Plaintiffs must show by a preponderance of the evidence that a *sub silentio* automatic-denial policy

11

caused their injuries.  Because they have failed to carry that burden, Plaintiffs lack standing to maintain this claim.

### B.    Subject Matter Jurisdiction

#### 1.    *Sub Silentio Policy*

Even if Plaintiffs' *sub silentio* policy claim were justiciable, the court lacks subject matter jurisdiction to consider it because Plaintiffs have failed to administratively exhaust it.  Claims "arising under" the Medicare Act, including claims for reimbursement, must be channeled through the administrative review system established specifically for such claims.  *See Greiner*, 2026 WL 63318, at *7 (citing *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 8 (2000), and explaining the channeling requirement).  Again, the parties do not raise it, but because subject matter jurisdiction "goes to the foundation of the court's power to resolve a case," "the court is obliged to address it *sua sponte*."  *Doe ex rel. Fein v. District of Columbia*, 93 F.3d 861, 871 (D.C. Cir. 1996).

The court does not have subject matter jurisdiction over Plaintiffs' covert-policy challenge because it was not channeled through the Medicare administrative appeals process.  *See Greiner*, 2026 WL 63318, at *7.  The court can find no instance in the Joint Appendix of Plaintiffs having made the argument that CMS was covertly applying the automatic-denial policy of the February 2022 TDLs to deny Plaintiffs' reimbursements claims.  Although Plaintiffs did argue on administrative appeal that "the MAC's denial of its claims was based on a change in a substantive standard governing Medicare coverage and reimbursement that has not been published as a final regulation as required by 42 U.S.C. § 1395hh(a)(2)," *see* Pls.' Mem. at 13, that argument was made as to the application of specific Medicare criteria and standards to individual reimbursement determinations, not the application of a blanket policy.  *See, e.g.*, J.A. at 15–18 (arguing that the

ALJ's reliance on the lack of clinical trial evidence supporting Macomb's use of Corplex P to deny a claim for reimbursement was itself an imposition of a substantive standard requiring notice-and-comment rulemaking); *id.* at 18–19 (characterizing the ALJ's determination that Macomb lacked evidence that use of Corplex P was not experimental as a substantive change in law requiring notice-and-comment rulemaking).  That is not the same as the argument they make now that the agency continued *sub silentio* to apply the automatic-denial policy of the rescinded TDLs.

Because Plaintiffs have not exhausted their claim that CMS continued to covertly apply an automatic-denial policy to deny reimbursement claims for Corplex P, the court does not have jurisdiction to adjudicate it.

### 2.    *Macomb's December 13, 2021 Claim*

That leaves the two reimbursement denials.  Here, there is no dispute that the ALJ's denials of Macomb's claims as to services rendered on October 25, 2021, and November 22, 2021, and the Medicare Appeals Council's denials of FASA's claim for all eight beneficiaries constitute final agency action and that the court has jurisdiction to hear Plaintiffs' challenges under the APA. *See* Pls.' Mem. at 15–16; Defs.' Mem. at 2.  The court agrees that it has jurisdiction to review those two denials.

But Defendants assert a jurisdictional bar as to a third.  *See* Defs.' Mem. at 20–21.  An ALJ dismissed Macomb's claim for reimbursement as to service rendered on December 13, 2021, because it was apparently never considered for initial redetermination by a MAC or for subsequent redetermination by a QIC.  *See* J.A. at 54; 42 C.F.R. §§ 405.972(b)(3), 405.1052(a)(5); 42 U.S.C. § 1395ff(a)(3)(B).  In their request for an administrative hearing, Plaintiffs stated that "[t]o the best of [their] knowledge, this date of service was appealed at the Redetermination level" and that "it would not have been logical for Provider to appeal the first two dates of service but not the third."

J.A. at 92 n.2.  That contention is belied by the administrative record.  The December 13, 2021 date of service is conspicuously absent from Macomb's redetermination request forms both to the MAC and to the QIC.  *Id.* at 58, 77; *see also id.* at 61.  The issue also was discussed at the administrative hearing, where the ALJ stated he would investigate further and issue a decision accordingly.  *See id.* at 162–63.  The ALJ ultimately dismissed the request for an administrative hearing as to the December date of service because Plaintiffs had "no further appeal rights for this claim" under the applicable Medicare appeals regulations.  *Id.* at 44.

In their request for review to the Medicare Appeals Council, Plaintiffs maintained that "[m]edical records for this date of service were part of the hearing record and should be considered as included in this appeal."  *Id.* at 9 n.1.  But regardless of what may have occurred during the administrative appeals process, *see id.* at 161–63, the claim as to the December date of service comes before this court without having been reviewed by an ALJ.  Macomb renews before the court its challenge to the denial of the December date of service but did not address the QIC's or ALJ's dismissals in its Amended Complaint or in its briefs.  *See generally* Corrected Am. Compl., ECF No. 16 [hereinafter Am. Compl.]; Pls.' Mem.; Pls.' Opp'n.  Macomb's claim as to the December 13, 2021 date of service has not been administratively exhausted, so the court does not have subject matter jurisdiction to review it.

### 3.    *Other Jurisdictional Bases*

As a final threshold issue, Plaintiffs also have asserted as grounds for jurisdiction the Mandamus Act and the All Writs Act.  *See* Am. Compl. ¶¶ 17, 132–144.  Oddly, these bases go both unchallenged and undefended in the parties' briefs.

The "extraordinary remedy" of a writ of mandamus is not available where there is another adequate remedy.  *Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521,

1533 (D.C. Cir. 1983).  Here, Plaintiffs have another adequate remedy in the APA.  The court

therefore holds sua sponte that Plaintiffs cannot invoke mandamus jurisdiction.  *See id.* (denying

mandamus jurisdiction where the plaintiffs had a cause of action under the APA); *see also In re*

*Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022) ("The All Writs Act does not grant

jurisdiction to issue a writ of mandamus" but "authorizes the issuance of a writ of mandamus in

aid of jurisdiction [a] court already has or will have as a result of issuing the writ.").

## C.    Final Decisions

Having determined that the court has jurisdiction only as to the two final decisions denying

Plaintiffs' claims for Medicare reimbursement for Macomb's use of Corplex P on October 25,

2021, and November 22, 2021, and FASA's use of Corplex P as to the eight beneficiaries, the court

now turns to whether those decisions conformed with the requirements of the APA.  The court

holds that they did.[3]

Plaintiffs lodge numerous objections to the agency's final decisions.  The court first

addresses arguments specific to Macomb's and FASA's final decisions and concludes with

Plaintiffs' refrain across all decisions that seemingly any application of the "reasonable and

necessary" criteria constituted a substantive change in law requiring notice-and-comment

rulemaking.[4]  Because Plaintiffs do not clearly distinguish their arbitrary-and-capricious and

unsupported-by-substantial-evidence arguments, the court considers them together.  *See ADAPSO*,

---

[3] The court did not consider the two declarations attached to Plaintiffs' opening brief.  *See generally* Pls.' Mot. Although the court may sometimes consider extra-record evidence, *see United Student Aid Funds*, 237 F. Supp. 3d at 3–4, there is no reason to do so here.  Plaintiffs argue that the court should do so because they "not only seek[] judicial review of final agency decisions based on the administrative record, but also seek[] additional relief beyond the scope of review of individual Medicare claims."  Pls.' Opp'n at 3 n.1.  But because the court only has jurisdiction to review the two final decisions, there is no occasion to consider the extra-record evidence.

[4] Plaintiffs also argue for the first time in their responsive brief that the agency was wrong in their application of the no-fault criteria to find Plaintiffs liable for the reimbursement denials.  *See* Pls.' Opp'n at 22 n.24.  The court does not consider this argument.  "It is well established that an argument first presented in a reply brief before the district court is forfeited."  *In re Sealed Case*, 77 F.4th 815, 829 (D.C. Cir. 2023).

745 F.2d at 684; *cf. Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992) ("An agency action is arbitrary and capricious if it rests upon a factual premise that is unsupported by substantial evidence." (citing *ADAPSO*, 745 F.2d at 683–84)).

    *1.  Macomb*

Macomb challenges the denials of its two claims for reimbursement for three primary reasons: the agency erred by (1) applying regulations Plaintiffs argue do not apply to Section 361 products such as Corplex P; (2) ignoring a practitioner witness's testimony; and (3) relying on inapposite guidances and warning letters issued by the FDA or CMS. The court addresses each in turn.

    a.  <u>Regulation as a Section 361 product</u>

Plaintiffs' overarching protest is the same as the one made in *Greiner*—that the Secretary incorrectly applied Section 351 standards to Section 361 products. *See* 2026 WL 63318, at \*10. Recall that the argument goes like this: Corplex P is regulated under Section 361. Section 361 products, unlike drugs and biologicals regulated as Section 351 products, do not require FDA pre-market review and approval and therefore are not subject to FDA regulations requiring clinical trial data or specific indications for use. The ALJ's reliance on Medicare standards applicable to drugs and biologicals and the absence of compelling clinical trial data, therefore, is an erroneous application of Section 351 standards to Corplex P, a Section 361 product. *See* Pls.' Mem. at 18–20, 30–31.

This court in *Greiner* explained that this argument "conflates a drug or biological's regulatory classification with the FDA with Medicare's coverage criteria." *Greiner*, 2026 WL 63318, at \*10 (cleaned up). Medicare regulations expressly distinguish Medicare coverage from FDA approval. *See* Medicare Program; Revised Process for Making Medicare National Coverage

16

Determinations, 68 Fed. Reg. 55634, 55636 (Sept. 26, 2003).  CMS and the FDA may review similar evidence to make their respective determinations.  But the purpose and substance of their review is different: "Whereas the FDA must determine that a product is safe and effective as a condition of approval, CMS must determine that the product is reasonable and necessary as a condition of [Medicare] coverage.  *See id.*  "Reasonable and necessary" and "safe and effective" are distinct standards, and "the authority to determine which devices are reasonable and necessary . . . is conferred by Congress upon Medicare, . . . not the FDA—an agency with a separate statutory purpose and agenda."  *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 84 (2d Cir. 2006).  "So, a product that satisfies the relevant requirements for use or sale under the FDA may nonetheless be ineligible for reimbursement by Medicare."  *Greiner*, 2026 WL 63318, at *10.

Moreover, the FDA has expressly disclaimed any "determination that an establishment is in compliance with applicable rules and regulations or that the HCT/P is licensed or approved by [the] FDA" by virtue of having registered a product as a Section 361 product.  *See* J.A. at 53, 115.  "If FDA approval is not alone sufficient for Medicare coverage, then surely something less than approval is not either."  *Greiner*, 2026 WL 63318, at *11.  StimLabs may have registered Corplex P as required by Section 361, but that has little bearing on whether any instance of its use is covered by Medicare.  Indeed, Plaintiffs themselves acknowledge that the FDA's "decisions are not dispositive of Medicare coverage or reimbursement."  Pls.' Mem. at 7 (citing *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 350 (2001)).

Still, Plaintiffs maintain that the ALJ's incorrect application of Section 351 criteria to a Section 361 product manifests in several ways:

*Application of Medicare Benefits Policy Manual.*  Plaintiffs insist that the ALJ's many references to Medicare coverage criteria as relevant to "drugs or biologicals . . . alone establish[]

that the Secretary's final decision is arbitrary and capricious due to the repeated reliance on laws and interpretations that are irrelevant to determining Medicare coverage for HCT/P products, which do not meet the definition of a drug or a biological." Pls.' Mem. at 18–19. True, under FDA regulations, there is a difference between products regulated under Section 361, including Corplex P, and drugs, devices, or biological products regulated under Section 351. *See* Human Cells, Tissues, and Cellular and Tissue-Based Products; Establishment Registration and Licensing, 66 Fed. Reg. 5447, 5449 (Jan. 19, 2001). But that is not relevant to the denials of Macomb's claims for Medicare reimbursement.

To start, throughout the administrative appeals process, Plaintiffs repeatedly characterized Corplex P as a "drug or biological" for Medicare purposes, referring numerous times to Chapter 15, Section 50 of the Medicare Benefits Policy Manual ("MBPM") called "Drugs and Biologicals" as the applicable section. For example, in their letter seeking review by the Medicare Appeals Council, they wrote, "Macomb timely appealed the Reconsideration to the ALJ level in which it again presented the *most applicable guidelines* set forth in the [MBPM], specifically MBPM Chapter 15, Section 50 – Drugs and Biologicals, and demonstrated that Corplex P met the MBPM's criteria for reasonable and necessary coverage." J.A. at 9 (emphasis added). In their request for a hearing before an ALJ, they explicitly described Corplex P as a "human tissue allograft and a *biologic*," *id.* at 93 (emphasis added); referred to the criteria set forth in MBPM Chapter 15, Section 50 to make their case, *id.* at 96–97; and stated that, because "HCT/Ps are generally considered biologics," "the closest provisions governing coverage are found in the Medicare Benefit Policy Manual, Chapter 15, section 50 – Drugs and Biologics," *id.* at 97. And at the administrative hearing, counsel for Macomb repeated that "HCT/Ps are generally considered biologics" and that "the closest provision governing coverage [is] MBPM, Chapter 15,

18

Section 50." *Id.* at 173. That same characterization and argument persisted at other levels of review. *See id.* at 130–31. The ALJ accordingly also relied on that section of the MBPM to render his decision. *Id.* at 52–54.

Plaintiffs now say that the ALJ "did not address the merits of Macomb's argument that Corplex P is a[n] HCT/P and not a drug or biological." Pls.' Mem. at 14. That is because Macomb did not make this argument before the ALJ. The court does not have jurisdiction over Plaintiffs' contentions now that the drugs-and-biologicals section of the MBPM categorically is irrelevant to Corplex P or that Corplex P is not a biologic, as these positions differ from the ones exhausted in the administrative appeals process. *See StimLabs I*, 636 F. Supp. 3d at 176 ("[A] claimant cannot bring a challenge in federal court that it has not raised before the agency." (citing *Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 826 (D.C. Cir. 2018))). Plaintiffs' affirmative positions below were that MBPM Chapter 15, Section 50 *does* apply to Corplex P and that Macomb's uses of Corplex P satisfied that section's criteria. Plaintiffs cannot conveniently "take a position in this court opposite from that which it took" before the agency with hopes of a favorable outcome. *See Del. Dep't of Nat. Res. & Env't Control v. EPA*, 895 F.3d 90, 96 (D.C. Cir. 2018); *see also Greiner*, 2026 WL 63318, at *12 n.6.

At bottom, the ALJ's references to Chapter 15, Section 50 of the MBPM did not constitute a "plain error of law." *See* Pls.' Mem. at 18–19. They are not erroneous applications of "legal standards applicable of drugs and biologicals governed under Section 351 . . . that have nothing to do with HCT/Ps governed under Section 361." *See* Pls.' Opp'n at 22. Corplex P's registration as an HCT/P regulated by the FDA under Section 361 did not preclude or exempt the ALJ from applying, as statutorily required, the relevant criteria to determine whether each use of Corplex P

19

was "reasonable and necessary." *See Greiner*, 2026 WL 63318, at \*12.  That section of the MBPM serves to guide the agency in making that determination.[5]

 *FDA approval.*  The ALJ's reasoning that Macomb's use of Corplex P was not "reasonable and necessary" in part because its use was not FDA approved also is not an erroneous application of a Section 351 requirement to a Section 361 product.  *See* J.A. at 52–53; Pls.' Mem. at 20. Referring to the MBPM, the ALJ specified that FDA-approved products used as indicated are considered "safe and effective" for purposes of Medicare coverage and that MACs and QICs will "deny coverage for drugs and biologicals, which have not received final marketing approval by the FDA, unless it receives instructions from CMS to the contrary."  *See* J.A. at 52 (citing MBPM § 50.4).  Plaintiffs do not offer any indication CMS has rendered any such contrary instruction or that Corplex P had FDA approval at the time of the agency's final decision.  It matters not whether "Corplex P was applied to the beneficiary's wound for its intended homologous use as defined by the FDA."  *See* Pls.' Mem. at 20.  Compliance with FDA regulations is not dispositive of Medicare coverage.

 *Clinical trial evidence.*  Plaintiffs also argue that the ALJ's conclusion that "the clinical evidence offered by [Plaintiffs] shows that current research is insufficient to support the use of the drug conclusively" was an erroneous application of "legal standards for products regulated under Section 351."  *See* Pls.' Mem. at 23–24; J.A. at 52–53.  That Section 361 products, unlike Section 351 products, do not require clinical trial data for use or sale, again, is inapposite here.

---

[5] Plaintiffs also argue for the first time in their responsive brief that Corplex P is not a "biological product" as defined by a specific FDA regulation.  *See* Pls.' Opp'n at 8.  Again, Plaintiffs have forfeited this argument.  *See supra* n.4. But Plaintiffs also do not explain why the court should give weight to an FDA regulatory definition in its review of a Medicare coverage determination.

The agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Fox*, 556 U.S. at 513. It was well within the ALJ's discretion to consider clinical data "for purposes of determining whether a particular use of [Corplex P] was 'reasonable and necessary,' regardless of whether such data was required by the FDA." *Greiner*, 2026 WL 63318, at *10. Specifically, the ALJ could take into account that the clinical literature Plaintiffs submitted (1) was limited in sample size or not randomized and controlled, (2) suggested that comparison of similar HCT/Ps through randomized controlled trials was difficult, and (3) arguably established that "the ideal [HCT/P] for wound care has not yet been developed." *See* J.A. at 53. From this examination of the "relevant data," the ALJ's conclusion that "current research is insufficient to support the use of the drug conclusively," *id.*, is a "satisfactory explanation for" affirming the denials of Macomb's claims for reimbursement.

Contrary to Plaintiffs' contention, the ALJ did not "ignore[]" Corplex P's registration as a Section 361 product. *See* Pls.' Mem. at 18. He expressly acknowledged it. *See, e.g.*, J.A. at 47, 52–53 n.3. That fact simply was not determinative of whether its use was reimbursable under the Medicare statute. The ALJ's references to anything Plaintiffs believe resemble Section 351 FDA-approval criteria are merely evidence of the agency's compliance with its statutory obligation to determine whether each use of Corplex P was "reasonable and necessary."

### b.    Dr. Sundblad's testimony

Next, Plaintiffs argue that "the ALJ did not discuss the substance of Dr. Sundblad's testimony," Pls.' Mem. at 15, that is, the testimony of the provider who treated the beneficiary relevant to Macomb's reimbursement claim. They point to Dr. Sundblad's hearing testimony explaining "that he selected Corplex P due to its ability to drain fluid from the wound, and because it can be used to protect and cushion the tissue surrounding the wound" as support for their

21

proposition that it is "consistent with the Medicare Statute" that "[t]he physician, in accordance with medical necessity, determines whether a beneficiary with a particular condition or diagnosis may benefit from a Section 361 HCT/P, including Corplex P's, or any other Section 361 HCT/P's, homologous use."  Pls.' Mem. at 19.

For one, Plaintiffs' proposition mischaracterizes the law.  It is the Secretary, not the providing physician, who weighs the evidence and makes the ultimate determination as to Medicare coverage.  *See Friedrich v. Sec'y of Health & Hum. Servs.*, 894 F.2d 829, 838 (6th Cir. 1990) ("The only legitimate claim of entitlement under Medicare is to those services that are reasonable and necessary.  There is no legitimate claim of entitlement to a given medical procedure just because a doctor prescribes it or a patient requests it." (citation omitted)).  The reasons Dr. Sundblad specifically gave to justify treating the patient with Corplex P, regardless of its benefits, are therefore not authoritative in the ALJ's determination.  Notwithstanding the importance of a physician's judgment in his patient's care, "[t]he Medicare statute unambiguously vests final authority in the Secretary, *and no one else*, to determine whether a service is reasonable and necessary, and thus whether reimbursement should be made."  *New York ex rel. Bodnar v. Sec'y of Health & Hum. Servs.*, 903 F.2d 122, 125 (2d Cir. 1990) (emphasis added) (citing 42 U.S.C. § 1395ff(a)).

For another, though the ALJ did not specifically discuss Dr. Sundblad's hearing testimony, nothing in Dr. Sundblad's testimony ultimately undermined the ALJ's "reasonable and necessary" calculus.  Dr. Sundblad testified that he treated the patient with Corplex P "to protect and cushion the surrounding tissue," J.A. at 167, and because he believed it was an "effective product," *id.* at 166.  When asked to opine on Corplex P's "medical necessity" in that context, he stated only that he believed it was "good medical practice" to have treated that patient with Corplex P.  *Id.* at 166–

22

67. And although he felt that what constitutes "good medical practice" is "up to the doctor treating the patient," he also acknowledged that "Medicare[,] CMS[,] and the other companies have different ideas of what they think that is." *Id.* at 167. Finally, when asked why he did not think use of Corplex P in that instance was experimental or investigational, he responded simply that he "wouldn't have thought that [the agency] would view it as" experimental or investigational because "there's a lot of products that are similar to this" and it "has a Q code that's payable." *Id.* at 169–70.

These responses rightly carried little to no weight in the ALJ's review of whether the uses of Corplex P were reasonable and necessary for purposes of Medicare reimbursement. Whether one physician believes a product's use is "effective," "good medical practice," homologous, or common or whether the product has a corresponding Q code does not, by itself, indicate generally accepted use. *See* MPIM § 13.2.3 ("Acceptance by individual health care providers, or even a limited group of health care providers, does not indicate general acceptance of the item or service by the medical community."); *see also Almy v. Sebelius*, 679 F.3d 297, 307 n.3 (4th Cir. 2012) ("[T]he HCPCS code book contains a disclaimer that '[i]nclusion or exclusion of a procedure, supply, product or service does not imply any health insurance coverage or reimbursement policy.'" (second alteration in original) (citation omitted)). Certainly, whether a use was reasonable and necessary requires determining whether it was "safe and effective," "not experimental or investigational," "appropriate," and "[f]urnished in accordance with accepted standards of medical practice." *See* MPIM § 3.6.2.2. But that determination must be made by the agency—not the treating physician—using evidence "such as published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines." *See id.* § 13.5.3; *infra* Section IV.C.2.a. The ALJ concluded

23

that there was an absence of such evidence weighing in favor of the use's reasonableness and necessity, *see supra* Section IV.C.1.a, and ultimately disagreed with Dr. Sundblad's subjective viewpoint.

The ALJ was required only to "examine the relevant data and articulate a satisfactory explanation for its action." *Fox*, 556 U.S. at 513.  The ALJ properly considered and explained the *lack* of relevant data as a basis for his decision to deny reimbursement.

c.      <u>Agency guidance</u>

Finally, Plaintiffs object to the ALJ's reliance on several publications issued by the FDA or CMS.  Their objections do not hold up for several reasons.

The first is to the July 2020 FDA Consumer Alert warning consumers about regenerative medicine products.  *See* J.A. at 50.  Plaintiffs characterize the 2020 FDA Consumer Alert as one applying only to stem cell and exosome products and therefore contend that it is "inapplicable to products like Corplex P, which do not contain either exosomes or stem cells, and are not intended for use as a treatment."  Pls.' Mem. at 21.  They also argue that the 2020 FDA Consumer Alert is "neither a binding regulation nor an interpretive rule."  *Id.*  Both these arguments fail.

Taking the latter contention first, the fact that the consumer alert is "neither a binding regulation nor an interpretive rule" is of no moment.  ALJs can consider a host of evidence, including studies, hearing testimony, and patient records—all things Plaintiffs themselves offered to the ALJs for consideration.  *See also infra* Section IV.C.2.a.

Second, Plaintiffs' representation that the alert is "inapplicable to products like Corplex P" because Corplex P is not a stem cell or exosome product is plainly inaccurate.  The consumer alert covered stem cell and exosome products in addition to "products derived from . . . human umbilical cord blood [or] Wharton's Jelly"—of which Corplex P is one.  *See* 2020 FDA Consumer Alert.

24

And it specifically highlights that no such products "have been approved to treat . . . chronic pain." *Id.* Plaintiffs expend considerable effort to distinguish Corplex P from exosome and stem cell products to position it as falling outside the scope of the FDA's concerns. *See, e.g.*, Pls.' Mem. at 2, 6, 10, 21; Pls.' Opp'n at 17–18, 24, 28. Yet the alert is exactly on point to the uses at issue— the use of a product derived from human umbilical cord or Wharton's jelly to treat chronic pain.

The same goes for Plaintiff's objection to the 2021 FDA Consumer Alert, which reemphasizes the 2020 FDA Consumer Alert. Plaintiffs have no basis on which to repudiate this publication, as it, too, is directly on point to the use of a product derived from human umbilical cord or Wharton's jelly to treat chronic pain.

Plaintiffs also object to the ALJ's "reliance" on the 2021 CMS Guidance and FDA warning letters related to amniotic-fluid-derived products. *See* Pls.' Mem. at 22–23. But the ALJ's actual reliance on these documents, even if not squarely applicable, is questionable. The ALJ mentioned them in the section of his decision laying out the background context for HCT/P regulation. But he did not refer to them again in his finding of facts or conclusions of law. The court does not have the 2021 CMS Alert and FDA warning letters before it, but even if the ALJ considered them as background, there was nothing improper in his doing so.

### 2.    FASA

FASA, too, argues that the Secretary "applied incorrect legal standards as discussed above." Pls.' Mem. at 25–26. The court assumes Plaintiffs mean to incorporate arguments that the agency incorrectly applied Section 351 criteria to a Section 361 product. To the extent the final decisions as to Macomb and FASA overlap, those sections of the court's decision relevant to Macomb also apply to the court's review of FASA's claim. *See* Section IV.C.1; Pls.' Mem. at 28–

30; J.A. at 198–99 (Appeals Council explaining that FDA categorization is not determinative of Medicare coverage).

FASA advances three other reasons to challenge the Secretary's final decision: the agency erroneously (1) relied on inapplicable sections of the Medicare Program Integrity Manual ("MPIM"), (2) disregarded the treating physician's hearing testimony, and (3) overlooked evidence supporting the medical necessity of the uses of Corplex P.

a. <u>MPIM</u>

Plaintiffs argue that the Appeals Council's reliance on Chapters 3 and 13 of the MPIM was error, because these chapters are "interpretive rules that do not have the force of law and do not even apply to the claims for Corplex P." *See* Pls.' Mem. at 25. Both arguments fail.

To start, that "interpretive rules . . . do not have the force of law" is immaterial to whether the Appeals Council could rely on the MPIM to render its decision. The MPIM may very well be an interpretive rule without the force and effect of law. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 102–05 (2015). But there is nothing improper about an adjudicator relying on an agency's interpretation of the law to apply it—that is why the agency issued the guidance in the first place. In fact, while "ALJs and attorney adjudicators and the Council are not bound by . . . CMS program guidance, such as program memoranda and manual instructions," they are to "give substantial deference to these policies if they are applicable to a particular case." 42 C.F.R § 405.1062(a). There was therefore nothing arbitrary about the Appeals Council's reliance on the MPIM to inform its decisionmaking. *Cf. Pres. Soc'y of Newport Cnty. v. Burgum*, No. 23-cv-3510, 2026 WL 787910, at *17 (D.D.C. Mar. 20, 2026) ("An agency following its own rules and regulations 'seldom acts arbitrarily.'" (quoting *Nat. Res. Def. Council v. EPA*, 25 F.3d 1063, 1073 (D.C. Cir. 1994))).

Plaintiffs' argument as to Chapter 3 is easily refuted.  Plaintiffs maintain that nothing in Chapter 3 "states that the criteria discussed there are to be used to make or review individual claim determinations, or that they would be given any weight in adjudicating those claims." Pls.' Mem. at 26.  That is plainly belied by the Medicare regulations and Chapter 3 itself.  The Medicare regulations specify that, "[i]n circumstances when there is no published policy on a particular topic, decisions are made based on the individual's factual situation."  68 Fed. Reg. 63692, 63693.  The agency makes these individual determinations according to Chapter 3, specifically MPIM § 3.6.2.1.  *See* MPIM § 3.3.3.  MPIM § 3.6.2.1 requires that agencies deny a claim for reimbursement if, among other things, the "item or service is not reasonable and necessary under" the Medicare statute.  And MPIM § 3.6.2.2 clearly sets forth that, in the absence of a national or local coverage determination, MACs "shall consider an item or service to be reasonable and necessary if the item or service meets" several criteria, including that it is "safe and effective" and "not experimental or investigational."  There is no coverage determination governing the use of Corplex P to treat chronic ulcers.  Chapter 3's guidance therefore is squarely applicable to determining whether the use of Corplex P was "reasonable and necessary."  *See also Greiner*, 2026 WL 63318, at *9–13 (affirming Defendants' denials of other providers' reimbursement claims for use of an HCT/P because the agency applied the "reasonable and necessary" criteria as set forth in MPIM § 3.6.2.2).

As to Chapter 13, Plaintiffs insist that the criteria there "are used by MACs when they develop Local Coverage Determinations," not to make "individual claim determinations in the absence of a Local Coverage Determination." Pls.' Mem. at 25–27.

Plaintiffs are right that Chapter 13 covers "Local Coverage Determinations." *See generally* MPIM ch.13.  The Appeals Council acknowledged this.  *See* J.A. at 194.  But it also explained

27

that, because "Chapter 3 does not provide specific examples of evidence that would support a determination that an item or service is reasonable and necessary for purposes of an individual coverage determination," it was "appropriate to consider [Chapter 13's] examples of acceptable evidence because the development of [local coverage determinations] fundamentally involves making determinations of reasonableness and necessity." J.A. at 194–95. "Further," the Appeals Council continued, "while the MPIM provisions we have discussed are explicitly guidance for contractors assessing medical reasonableness and necessity, they necessarily apply to adjudicators, including ALJs and the Council, reviewing the contractor's medical reasonableness and necessity determination." *Id.* at 195 (citing 42 C.F.R. § 405.1062).

Indeed, at every level and facet of Medicare reimbursement, the task is the same: to comport with the statutory requirement that only "reasonable and necessary" items or services are reimbursed. *See* 42 U.S.C. § 1395y(a)(1)(A). This is true of adjudicating individual claims. *See* MPIM § 3.6.2.1. And it also is true of developing local coverage determinations. An item or service may be covered by such determination only if it "is reasonable and necessary under" the Medicare statute, and "[o]nly reasonable and necessary provisions are considered part of the [local coverage determination]." *Id.* § 13.5.4. The criteria used to determine whether "evidence exist[s] to consider an item or service" is "reasonable and necessary" for the purposes of those determinations are the same as those used to make an individual claim determination. *Compare id.* (use must be "safe and effective," "not experimental or investigational," etc.), *with id.* § 3.6.2.2. *See also Almy*, 679 F.3d at 400 ("Rather than create distinct criteria for individual claim determinations and [local coverage determinations], the Secretary has directed contractors to apply a uniform set of standards . . . .").

Plaintiffs cite no authority to refute the Appeals Council's reasoning that those shared goals justify looking to Chapter 13 to inform its adjudication of an individual claim.  Plaintiffs also do not identify what types of evidence it should have considered besides their own hearing testimony and Section 361 registration.[6]  *See* J.A. at 195.  The Appeals Council therefore "reasonably explained" its decision to rely in part on relevant portions of Chapter 13 of the MPIM to conclude that FASA's uses of Corplex P were not reasonable and necessary.  *See Prometheus Radio*, 592 U.S. at 423.

### b.    Dr. Dang's testimony

Plaintiffs argue that the testimony of Dr. Dang, the treating physician at FASA relevant to the claims at issue, J.A. at 210–12, at the administrative hearing "confirms" the medical necessity of Corplex P for FASA's eight beneficiaries.  *See* Pls.' Mem. at 28.  Again, Plaintiffs fail to appreciate that "[t]he Medicare statute unambiguously vests final authority in the Secretary, *and no one else*, to determine whether a service is reasonable and necessary." *Bodnar*, 903 F.2d at 125 (emphasis added).  Dr. Dang opined on the medical necessity of Corplex P specifically as to FASA's eight patients and whether those uses of Corplex P conformed with the relevant standard of care.  *See* J.A. at 303–17.  But Dr. Dang's assessments are not determinative for purposes of Medicare coverage.  *See also supra* Section IV.C.1.b (analyzing Dr. Sundblad's testimony).  The Appeals Council properly noted that "although an item or service may be beneficial or even necessary for the treatment of a Medicare beneficiary, that does not mean that the item or service is covered by Medicare," J.A. at 202, and concluded that the other evidence in the record did not

---

[6] The Appeals Council did note that Plaintiffs had argued that, "instead of the MPIM entirely, [the Appeals Council] should apply MBPM, Ch. 15, § 50," J.A. at 195 n.4, the same section that Plaintiffs now argue before the court is wholly inapplicable to Corplex P.  *See supra* Section IV.C.1.a.  The Appeals Council rejected this argument, finding both that Plaintiffs had not established that Corplex P meets the definition of a "drug or biological" for Medicare purposes and that, even if it did, that section, too, requires that the use be "reasonable and necessary."  J.A. at 195 n.4. Plaintiffs do not appear to raise the applicability of this section of the MBPM as to FASA's claims before the court, presumably because they ask the court to reach the opposite conclusion with respect to Macomb's claims.

support a finding that FASA's uses of Corplex P were reimbursable under Medicare, *see infra* Section IV.C.2.c.

c.      <u>Clinical evidence</u>

The Appeals Council ultimately concluded that the ALJ "fail[ed] to identify and apply the applicable criteria and . . . to perform a proper and complete analysis of the reasonable and necessary standards set forth in the MPIM."  J.A. at 195.  It continued, "[d]espite the ALJ using some pertinent language from the applicable guidance, the ALJ failed to properly determine under the MPIM provisions whether the products are 'safe and effective,' 'not experimental or investigational,' and 'appropriate' based on 'the available evidence of general acceptance by the medical community.'"  *Id.* (citing MPIM §§ 3.6.2.2, 13.5.3).  The Appeals Council deemed the ALJ's findings "conclusory" and "incomplete," as the ALJ "did not analyze the strength of the appellant-provided medical literature" but rather "focused on appellant's compliance with 21 C.F.R. § 1271.10(a) and [Section 361] to find Corplex P not experimental or investigational."  *Id.* at 195–96.

Indeed, the only justifications the ALJ provided to support his conclusion were that "Corplex [P] was registered as a section 361 HCT/P during the appealed dates of service and the manufacturer had to adhere to the FDA's tissue rules and the registration, manufacturing, and reporting steps outlined under 21 C.F.R. § 1271" and that Plaintiffs "submitted peer-reviewed studies that support the use of cryopreserved umbilical cord allograft such as Corplex[ ]P as safe and effective treatment for improving the healing of hard-to-heal wounds."  *Id.* at 212–13.  The ALJ did not explain *how* Section 361 regulation or Plaintiffs' submitted studies rendered their uses of Corplex P reasonable and necessary.  He concluded without more that "the documentation and

30

hearing testimony support the procedures at issue for the application of Corplex [P] grafts were reasonable and medically necessary." *Id.* at 213.

The Appeals Council, by contrast, "articulate[d] a satisfactory explanation" for its conclusions after examining the relevant evidence. *Fox*, 556 U.S. at 513. It explained that regulation by the FDA as a Section 361 product was not determinative of Medicare coverage. J.A. at 198–99. And it explained why the literature in the record was insufficient to support the ALJ's findings. For example, it observed that none of studies involved or even mentioned Corplex P specifically and that their findings were "identified and captioned as provisional, preliminary, and based on small sample sizes" and themselves suggested that "prospective, randomized, controlled trials with larger sample sizes are warranted." *Id.* at 199–202. It also, unlike the ALJ, analyzed each "reasonable and necessary" criterion with specific references to evidence in the record to conclude that Plaintiffs had not demonstrated that FASA's uses of Corplex P were reasonable and necessary. *Id.* at 199–203. Thus, Plaintiffs' own conclusory assertions that the studies submitted "amply support[] the medical necessity of the use of Corplex P in these cases" and that the ALJ "clearly considered whether applying Corplex P to wounds is safe and effective, not investigational or experimental, and appropriate" do not carry the day. *See* Pls.' Mem. at 28–29.[7]

   3.  *Substantive Changes in Law*

Across both Macomb's and FASA's appeals, Plaintiffs appear to characterize any application of the "reasonable and necessary" criteria as a substantive change in law requiring

---

[7] Plaintiffs also slip in the contention that, "[n]ot only has FASA never been informed of the necessity of clinical studies, but it has also never been informed of what would constitute sufficient data." Pls.' Mem. at 29. The "reasonable and necessary" criteria are published in the MPIM and MBPM. These published agency guidances "provide fair notice" that the agency has interpreted its regulations to require adjudicators to "use the available evidence of general acceptance by the medical community, such as published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines," J.A. at 194, and that acceptance by individual providers or even a small group of providers is not enough to meet the standard for reimbursement, *id. See Howmet Corp. v. EPA*, 614 F.3d 544, 553 (D.C. Cir. 2010).

notice-and-comment rulemaking. For example, they argue that application of the MBPM criteria requires the Secretary to "first engage in notice and comment rulemaking as mandated in 42 U.S.C. § 1395hh(a)(2)." Pls.' Mem. at 19. They also assert that applying the MPIM's reasonable and necessary criteria was an "invalid attempt to take a non-binding interpretive rule that does not apply to adjudications and create a substantive standard for adjudications and make it so," contrary to the "command of 42 U.S.C. § 1395hh(a)(2)." *Id.* at 27. And they represented to the Appeals Council that CMS "changed its policies from one of reasonableness and medical necessity to one requiring additional evidence that Corplex P is not experimental, supported by clinical studies, and FDA approved." J.A. at 19.

Plaintiffs apparently argue that the criteria used to determine whether a use is "reasonable and necessary" are criteria that are altogether a departure from the statutory "reasonable and necessary" standard. As already discussed, the agency was statutorily mandated to consider whether a specific use of Corplex P was reasonable and necessary. That process requires the agency to evaluate whether Corplex P was "not experimental, supported by clinical studies, and FDA approved," among other things. *See id.*; *supra* Section IV.C.1.a. It was therefore permitted to refer to the MPIM and MBPM—agency guidances interpreting this statutory mandate—to make this determination.

Plaintiffs also argue that the Appeals Council's finding that the ALJ failed to evaluate the literature in the record was a mischaracterization of 42 C.F.R. § 405.1046(a)(2)(i), which requires the agency to include a "summary of any clinical or scientific evidence used in making the determination." Pls.' Mem. at 29. Plaintiffs aver that this regulation did not require the ALJ to discuss each study individually or that any specific document be summarized and that the Appeals Council's finding was an "improper[] attempt[] to impose a substantive rule where none exists."

*Id.*  But the ALJ did not even supply a high-level summary of the studies collectively.  He simply stated in conclusory fashion that the studies Plaintiffs submitted "support the use of cryopreserved umbilical cord allograft such as Corplex[ ]P as safe and effective treatment for improving the healing of hard-to-heal wounds."  J.A. at 213.  Moreover, the Appeals Council did not reverse the ALJ's finding on that technicality alone; the ALJ had failed to substantively engage with the "reasonable and necessary" criteria entirely.  *See supra* Section IV.C.2.c.  The Appeals Council's more thorough summaries and analyses of the literature was its way of carrying out its charge to demonstrate the "rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43.[8]

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment and Declarative Relief, ECF No. 22, is denied, and Defendants' Cross-Motion for Summary Judgment, ECF No. 29, is granted.  Plaintiffs' Motion for Oral Argument, ECF No. 38, is denied as moot.

A final, appealable order accompanies this Memorandum Opinion.

Dated:  March 31, 2026

Amit P. Mehta
United States District Judge

---

[8] Plaintiffs also say in passing that the ALJ's representation that "the clinical evidence offered by [Macomb] shows that current research is insufficient to support the use of the drug conclusively" constituted the fabrication and application of a new substantive "conclusive" standard without notice-and-comment rulemaking.  Pls.' Mem. at 23–24; *see* J.A. at 53.  Defendants explain that this "simply meant that the [ALJ] found that literature did not support the supplier's claims or show that it satisfied the preconditions to coverage" and point out that the ALJ expresses that same sentiment without the word "conclusively" elsewhere.  *See* Defs.' Mem. at 42 n.14 ("Based on the documentation and testimony presented at the hearing, the undersigned ALJ finds that the evidence is insufficient to show that [Corplex P] is reasonable and necessary for the diagnosis or treatment of the illness or injury for which it was administered . . . ." (citing J.A. at 53)).  Plaintiffs do not reply to this point in their responsive brief, and the court is sufficiently convinced by Defendants' explanation.